IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY HOLGUIN,

    Petitioner,

v.

MICHAEL HARRISON, in his capacity as Warden of the California State Prison, Los Angeles County, in Lancaster,

    Respondent.

No. C 05-01118 CRB

**OPINION**

Petitioner Anthony Holguin, a mentally retarded 17-year old boy, was convicted of first degree murder after a jury trial. There was no physical evidence linking him to the crime; instead, he was convicted primarily on the basis of his multiple confessions and one eyewitness. He seeks a Writ of Habeas Corpus on the grounds that his rights to Miranda warnings and effective assistance of counsel were violated.

**FACTUAL BACKGROUND**

At about 6:40 p.m. on March 14, 2000, Eric Inzunza was shot and killed in Salinas, California. Inzunza was a student at Alisal High School. There were three witnesses to the murder who identified the shooter as short and thin and wearing a white 49ers sweatshirt and a red baseball cap. Two of the witnesses claimed they saw the shooter get into a blue Honda after the shooting.

1    Holguin was a 17-year old special education student at Alisal High School when the
2 crime occurred. Holguin is mildly to moderately mentally retarded and has an IQ between 47
3 and 65. He cannot read or write, but can copy letters. Although Holguin tried to socialize
4 with other students, he was only marginally successful.

5    George Martinez, the campus security guard supervisor at Alisal High School, saw
6 Holguin at the scene of the murder at about 7:00 or 7:30 p.m. the evening of the shooting.
7 Holguin was not wearing clothes that matched the description of the shooter.

**A.  The Pre-<u>Miranda</u> Statements**

9    The day after the shooting, March 15, Holguin was suspended from school. The Vice-
10 Principal, Bernardo Munro ("Munro"), specifically told Holguin that he could not come to
11 school the next day, even to work in the cafeteria. Munro took extra time explaining the
12 suspension to Holguin because he knew Holguin was a special education student.

13    The next day, around lunchtime, Munro heard on his radio that Holguin had returned
14 to campus. Munro instructed a school official to bring Holguin to Munro's office. On
15 Munro's way to his office he met up with campus police officer Gilbert Bacis. Munro and
16 Officer Bacis took Holguin to Munro's office. Munro talked to Holguin about his
17 trespassing (a student who returns to school while on suspension is guilty of trespassing).
18 After Holguin agreed that he had been trespassing, Munro left Officer Bacis with Holguin to
19 either cite him for trespassing or release him. According to Munro, Holguin was not free to
20 leave the office at this time.

21    As Officer Bacis was talking to Holguin, he believed (mistakenly) that Holguin's
22 clothing and build matched the description of Eric Inzunza's shooter. He asked Holguin if
23 Holguin had done the shooting, and Holguin responded by shrugging his shoulders. Officer
24 Bacis knew that the detectives investigating the murder were coming to the school sometime
25 before lunch. He told Holguin that the detectives might want to talk to him, and then stepped
26 outside Monro's office to telephone the detectives.

27    Detectives Craig Carmena and Gerry Davis arrived at Munro's office a few moments
28 later. Officer Carmena walked into the office and overheard Holguin telling Officer Bacis

2

that he (Holguin) had a beef with Eric Inzunza. Officer Carmena immediately asked Holguin *why* he shot the victim even though Holguin had not said that he had been involved in the shooting. Holguin responded: "I did what I had to do." Officer Carmena then asked his partner to retrieve a tape recorder.

After obtaining the tape recorder, the police officers questioned Holguin in Munro's office about the shooting for approximately 15 minutes. They did not read Holguin his <u>Miranda</u> rights, nor attempt to contact his mother. Nor did they ever advise Holguin that he was free to leave. Holguin admitted to shooting Inzunza. He stated that Inzunza "was the wrong color I guess. The way I heard it that he had a blue sweater on and a blue cap, a blue beanie." After initially refusing to say why he killed Inzunza, Holguin then stated, "I didn't wanna do it, but I had to." "I just shot him because, ah, you know I wanted to and I had to, you know." He said he used a .22 gun. Holguin said that he shot Inzunza "in the stomach."

After initially saying he did not know where the gun was, Holguin then stated that he would go by himself to get it. Then, after telling the officers that his homies would have already taken the gun away, he agreed to show police officers where he put the gun. The detectives then took Holguin, by patrol car, to the creek where Holguin had told them that he hid the murder weapon. After looking around the creek, no weapon was found.

### B. The Post-<u>Miranda</u> Statements

Holguin was placed under arrest and read his <u>Miranda</u> rights. The officers recorded an interview of Holguin in the patrol car. They then brought Holguin to the police station, where he was again read his <u>Miranda</u> rights and was interviewed on videotape.

The same day Holguin confessed, a witness identified Holguin as the shooter when showed a photo lineup by police. The witness testified that he saw a newspaper picture of Holguin subsequent to the lineup that strengthened his certainty. The witness said that he was struck by a mark on one of Holguin's eyebrows, and said that he had "no doubt" that Holguin was the killer.

The police never found any physical evidence linking Holguin to the shooting.

//

**PROCEDURAL HISTORY**

Holguin was charged with first degree murder. Prior to trial his counsel moved to suppress his statements made to police both *before* and *after* he was read his Miranda rights. On the day of the hearing, however, counsel withdrew the motion regarding suppression of post-Miranda statements. After the evidentiary hearing on the pre-Miranda statements, the trial court denied the motion on the ground that Holguin was not in custody at the time the officers questioned him. A jury found Holguin guilty of first degree murder and of using a firearm during the commission of the murder. The trial court sentenced Holguin to 50 years to life.

On direct appeal, Holguin argued, among other things, that (1) the trial court erred by admitting his pre-Miranda statements, and (2) he was deprived of effective assistance of counsel when his counsel failed to challenge the admissibility of his post-Miranda statements as involuntarily made. The California Court of Appeal affirmed the conviction.

With respect to the Miranda violation, the court held:

> Here defendant was not under formal arrest at the time of his statements. He was engaged in a discussion about trespassing, which was not an unfamiliar situation. He was not handcuffed. Though the detention in the office lasted about 20 minutes, the questioning occurred while the door remained open and a secretary continued working. Defendant then agreed to show the officers where the gun was located. Defendant chose to ride with Bacis and was allowed to move freely about at the creek before he was arrested. There was no evidence that the demeanor of the officers was overbearing or that their questions were confrontational or accusatory at any time. Accordingly, considering the totality of circumstances, we agree with the trial court that a reasonable person in defendant's position would not have believed that his freedom of movement was restrained to the degree associated with a formal arrest.

Pet. Ex. 8 at 768.

The court went on to hold that even if the police had violated Holguin's Miranda rights, the error was harmless beyond a reasonable doubt:

> [Holguin] made three subsequent *Mirandized* confessions. [A witness] also positively identified [Holguin] as defendant's killer. Thus, absent evidence of the confession at the school, the jury would have found beyond a reasonable doubt that defendant committed the murder.

Id.

The court also rejected Holguin's ineffective assistance of counsel claim. The court reviewed the voluntariness of Holguin's post-Miranda statements de novo under the totality of the circumstances and found the statements were voluntary and therefore there was not ineffective assistance of counsel: "Though defendant was 17 years old and possessed subnormal intelligence, there was no evidence that the police used force, overbearing threats or promises of leniency." Id. at 771.

The California Supreme Court affirmed the Court of Appeal in a one-line order. Holguin then filed a state habeas petition with the California Supreme Court. In addition to renewing his previously-made assertions, he argued that his trial counsel was ineffective for failing to move to suppress his post-Miranda statements on the ground that his waiver of Miranda rights was not knowing and intelligently made. After the Supreme Court summarily denied his petition, he filed the pending federal habeas petition. He again alleges that (1) the admission of his pre-Miranda statements was in error and not harmless, and (2) his post-Miranda statements were involuntary *and* he did not knowingly and intelligently waive his Miranda rights, and therefore his counsel was ineffective by not moving to suppress the statements.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. section 2254(d) "is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision." Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003) (citing Williams, 529 U.S. at 412). "While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be 'reasonably' applied." Id.

Furthermore, if a constitutional error occurred, a federal habeas court may grant relief from a state court's unreasonable application of federal law only if the violation "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

//
//
//
//

6

**DISCUSSION**

**I.     The Pre-<u>Miranda</u> Statements**

Holguin argues that the State court's conclusion that he was not "in custody" when he made his pre-<u>Miranda</u> statements involved an unreasonable application of federal law and was not harmless error.

**A.     Custody**

In <u>Miranda v. Arizona</u>, the Supreme Court held that to protect an individual's Fifth Amendment rights, police must advise a suspect of the right to an attorney and to remain silent before they can subject that person to custodial interrogation. 384 U.S. 436, 444 (1966). Thus, for <u>Miranda</u> protections to apply, there must be (1) an interrogation, (2) by a police officer, (3) while the suspect is in custody. Here, the only factor in dispute is whether Holguin was in custody during the interrogation.

The law is well-established that

> [t]wo discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

<u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995) (internal quotation marks and citation omitted). "Courts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149 (2004) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322, 325 (1994)); <u>see</u> <u>also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984) (stating that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

The California Court of Appeal determined that Holguin was not in custody because he was not in an unfamiliar situation (he had been in the Vice Principal's office on more than

one occasion before), he was not handcuffed, the door to the office remained open and the secretary was sitting outside.  It also found relevant that Holguin agreed to show the officers where the gun was located, was allowed to choose which officer to ride with, and was allowed to move about freely at the creek to locate the gun.  In addition, the Court of Appeal stated that the police officers' questions were neither confrontational nor accusatory.

The Court of Appeal's conclusion involved an unreasonable application of federal law.  Although the court recited that it was considering the totality of the circumstances, it did *not* consider those factors that weigh in favor of an "in custody" finding.

The State court ignored that at the time of the questioning Holguin was in custody for the trespassing violation.  See Mathis v. United States, 391 U.S. 1, 4-5 (1968) ("[W]hen an individual is taken into custody or otherwise deprived of his freedom by authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized," even if the individual is "in custody" for a different offense from the one about which he is being questioned).  Holguin was brought involuntarily to the Vice-Principal's office because he was trespassing.  See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that fact that defendant came to police station voluntarily and was told that he was not under arrest suggested that he was not in custody).  After Holguin agreed that he had been trespassing, Vice-Principal Munro left Officer Bacis with Holguin to "cite" him or "release him."  Holquin was thus not free to leave, as Munro acknowledged.  As neither Officer Bacis nor the other officers ever cited or released Holguin, he remained in custody.  Nothing happened between the time Munro testified Holguin was not free to leave and the officers' questioning of Holguin that suggests a reasonable person in Holguin's position would have believed he had suddenly become free to leave.  The State court, however, simply ignored this critical fact.

The State court also ignored that Holquin was questioned in a "police dominated" location.  See Berkemer, 468 U.S. at 438-39.  In Berkemer, the defendant was pulled over for a traffic stop and asked by the officer if he had been using intoxicants.  Id. at 423.  In holding that the roadside questioning of a motorist does not constitute "custodial interrogation," the

8

court explained that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself." Id. at 439. Unlike the defendant in Berkemer, who was questioned in public by only one officer, Holguin was questioned by three officers in the Vice-Principal's office. Not only did the interrogation take place at a "police dominated" location, but it also took place in a disciplinary setting where a reasonable student, such as Holguin, would feel compelled to obey authority and answer questions when asked. The State court, however, simply ignored this factor too.

Moreover, in Stansbury v. California, the Supreme Court explained that "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned" is a factor that bears on the custody determination if those views are communicated to the person being questioned. 511 U.S. 318, 325 (1994). Here, the officers made it clear to Holguin that they suspected him of being the killer and that he was the focus of their investigation. Officer Bacis called two other officers to the school to question Holguin after telling Holguin that he matched the description of the shooter. See United States v. Wauneka, 770 F.2d 1434, 1439 (9th Cir. 1985) (characterizing an interrogation as accusatory when defendant was told that he matched description of rapist). The first question Officer Carmena asked Holguin was *why* he shot Inzunza. These facts demonstrate that the officers conveyed to Holguin that they believed he was the shooter. A reasonable person in Holguin's position would not believe he could simply get up and walk away while being accused by three officers of having committed a murder. See United States v. White, 890 F.2d 1413, 1416 (8th Cir. 1989) (holding that a reasonable person would not feel free to leave when an officer tells the person that he matches the description of a drug criminal). Although the United States Supreme Court has stated that such a factor is relevant to the custody analysis, again, the State court gave no consideration to this fact.

In light of these circumstances, it was unreasonable for the State court to conclude that Holguin was not in custody. The factors which the State court did consider do not make

9

the court's conclusion reasonable.  First, the court's reliance on the open door and secretary sitting outside Munro's office is not compelling.  Just because the door was open does not mean that one in Holguin's position would feel free to get up and walk away from the three officers who were questioning him about a murder, especially given that no one had released him since he had been detained for trespassing.  Moreover, the secretary's presence had nothing to do with the questioning and, if anything, a student in Holguin's situation might view her as an extension of the authority surrounding the office as opposed to an indication that he was free to go.

Second, that Holguin had been in the Vice-Principal's office on prior occasions and thus was in "familiar" surroundings does not support the conclusion that, under the circumstances here, a reasonable person would feel free to leave.  The scenario ceased to resemble past office visits once Holguin admitted to trespassing, and two additional officers arrived and accused Holguin of murder.

Third, that Holguin chose in which police vehicle to ride, and that he was allowed to walk unrestrained at the creek bed while searching for the gun, do not suggest a reasonable person in Holguin's position would have felt free to leave the officers.  Holguin did not get to choose *whether* to accompany the police; rather, at most, he was given a choice as to with which police officer to ride.  Regardless of which car Holguin chose, the officers were still directing him to get into a police vehicle.  The officers allowed Holguin to move freely about at the creek so that he could find the gun (which he never did).  A reasonable person would not have felt free to leave, or even have been able to leave; three armed officers took him to this remote location and closely watched him while he looked for the weapon.

The State court's reliance on the lack of handcuffs is also unreasonable.  While handcuffs may demonstrate that a defendant is in custody, the Supreme Court has never held that the lack of handcuffs suggests that a reasonable person would believe he was free to leave, especially where, as here, after already having been detained for another crime, he is being accused by three armed officers of having committed a murder.

10

Finally, the State court's assessment that "there was no evidence that . . . [the officers'] questions were confrontational or accusatory at any time" is flatly contradicted by the testimony of the officers and the State's transcript of the officers' interrogation of Holguin.  See 28 U.S.C. § 2254(d) (a federal court may grant a petition for habeas corpus if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Upon meeting Holguin, Officer Carmena immediately asked Holguin why he murdered Inzunza.  It is hard to imagine a more accusatory question.  The accusations continued, as is reflected by the State's transcript of the recorded interview.  Officer Carmena questioned Holguin: "Why did you shoot him, though.  What kind of beef did you have with him?"  "Where did you shoot this guy at?"  "What kind of, what kind of gun did you use?"

Officer Carmena asked Holguin, "And you got into a car?" because witnesses had reported that the murderer had fled in a car.  Holguin responded, "Nah, I didn't get in no car."  Officer Carmena, continuing with the accusatory nature of the interrogation, nonetheless stated: "Just now you told me you did get into a car."  When Holguin told the officers that he would not show them where the gun was located, Officer Carmena threatened to search his home:  "I don't wanna start tearing up your place and disrespecting your, your family your mom your, your brothers and sisters and all that.  If you show us where the gun is then we don't have to do that."  The State court's finding that the officers' questions were not confrontational or accusatory *at any time* cannot be reconciled with the undisputed record.  And, the State court's erroneous finding was critical to its custody determination because confrontational and accusatory questioning would cause a reasonable person to feel compelled to comply with the officers' instructions.

The Supreme Court's recent decision in Yarborough v. Alvarado--a case upon which the State relies--highlights the unreasonableness of the State court's analysis.  The Supreme Court concluded that the factors that weighed *against* a finding that the defendant (a minor) was in custody included: the police did not transport the defendant to the station or require him to appear at a particular time; the police did not threaten him or suggest he would be

placed under arrest; his parents remained in the lobby during the interview; the officer focused on the crimes of another rather than the defendant's; instead of pressuring the defendant with the threat of arrest and prosecution, the officer appealed to the defendant's interest in helping the police; the officer twice asked the defendant whether he wanted to take a break; and, at the end of the interview, the defendant went home. 124 S.Ct. at 2149-50. The Court concluded that "these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." Id. at 2150. The factors that weighed *in favor* of a finding that the defendant was in custody included: he was interviewed at the police station; the interview lasted two hours; the officer did not tell the defendant that he was free to leave; and the defendant was not brought to the police station of his own accord, rather his parents brought him. Id. at 2150. The Supreme Court concluded that as a reasonable jurist could find in these circumstances that the defendant was in custody, and also that he was not, the state court's determination that the defendant was not in custody was a reasonable application of the law. Id.

Virtually none of the facts that supported the no custody finding in Alvarado are present here. Holguin was involuntarily taken to the Vice-Principal's office because he was trespassing. Holguin was never released; instead, after over an hour of questioning he was handcuffed and formally arrested. The police never contacted Holguin's mother and Holguin was alone during the entire interrogation. The officers' questions focused on Holguin; indeed, they immediately accused him of the murder. Holguin was never offered a break. And the officers threatened Holguin that if he did not cooperate, if he did not show them where the gun was located, the officers would have to "start tearing up your place and disrespecting your, your family your mom your, your brothers and sisters and all that." Moreover, the factors that weighed in favor of an "in custody" finding in Alvarado are present here: the officers interviewed Holguin for over an hour before they read him his Miranda rights; they never told him he was free to leave; and he did not voluntarily appear for questioning.

12

In sum, the State court's determination that Holguin was not in custody when the officers questioned him for nearly an hour in the Vice-Principal's office, the patrol car, and while looking for the gun near the creek involved an unreasonable application of controlling federal law. Although clearly established Supreme Court precedent establishes that a court must weigh the "totality of the circumstances," the State court's analysis ignored material factors that compel an "in custody" finding and it relied on factors that bore little, if any, relevance to the inquiry. The decision was also based on findings of fact which the undisputed record demonstrates were clearly erroneous.

### B.  Harmless Error

Having determined that Holguin's statements made before he was read his Miranda rights should not have been admitted at trial, and the State court's conclusion to the contrary was unreasonable, the Court must next determine whether the admission of the statements was harmless error.

"The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error." Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002) (citing Neder v. U.S., 527 U.S. 1, 18 (1999)). On collateral review, the test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1991) (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000) (the Brecht standard applies uniformly in all federal habeas corpus cases under section 2254).

In determining whether an error is harmless, the reviewing judge should ask, "Do I, the judge, think that the error substantially influenced the jury's decision?" O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "A reviewing court does not examine whether there was sufficient evidence to support the conviction in the absence of constitutional error." Ghent, 279 F.3d at 1127; see also Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (emphasizing the Kotteakos Court's caution that "[t]he inquiry cannot be merely whether there was enough to support the result"). Instead, the reviewing "court must find that the

13

error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998). Where error is found, the state bears the burden of instilling in the court a "fair assurance" that it did not have a substantial and injurious effect on the jury's verdict. See Valerio v. Crawford, 306 F.3d 742, 762 (9th Cir. 2002). "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." O'Neal, 513 U.S. at 445.

Although the Supreme Court held in Arizona v. Fulminante, 499 U.S. 279 (1991), that the erroneous admission of confessions is subject to harmless error analysis, the Supreme Court, along with state supreme courts and lower federal courts, have recognized the substantial influence that a defendant's confession usually has on a jury's verdict. In Rice v. Wood, 77 F.3d 1138 (9th Cir. 1996), the Ninth Circuit summarized Fulminante and explained the effects of the admission of a confession on defense strategy:

> All of the Justices in Fulminante agreed that a defendant's full confession is not just another piece of evidence; it is the one item that, alone, can form the basis of conviction by removing what otherwise would be a reasonable doubt. Fulminante, 499 U.S. at 296 (White, J., opinion of the Court) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.") (internal quotations omitted; id. at 312 (Rehnquist, C.J., opinion of the Court) ("An involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors--in particular cases it may be devastating to a defendant . . ."; id. at 313 (Kennedy, J., concurring) ("Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence.").
>
> Nor is the effect of a confession limited to the weight it might carry with the jury: Admission of a full confession immensely complicates the defendant's trial strategy; it puts pressure on him to give up the right to remain silent; it can foreclose alternative theories of the defense (such as an alibi) that are inconsistent with the confession. A wrongfully admitted confession also forces defendants to devote valuable trial resources neutralizing the confession or explaining it to the jury, resources that could otherwise be used to create a reasonable doubt as to some other aspect of the prosecution's case. The devastating effect of a full confession on the defendant's case is not a matter of speculation -- it is hard fact documented in many judicial opinions and discussed widely in law review articles.

Id. at 1142; see also United States v. Garibay, 143 F.3d 534, 540 (9th Cir. 1998) (a defendant's inculpatory statement "is probably the most probative and damaging evidence

14

that can be admitted against him") (quoting Fulminante, 499 U.S. at 296); Henry v. Kernan, 197 F.3d 1021, 1030 (9th Cir. 1999) (no other evidence of intent could have impressed the jury in the same way that defendant's own statements did, particularly because his confession was played in full for the jury); People v. Neal, 31 Cal. 4th 63, 86 (2003) (although erroneous admission of a confession might be harmless in a particular case, it nevertheless is "likely to be prejudicial in many cases") (internal quotation mark and citation omitted).

Here, the State court concluded that the admission of the pre-Miranda statements was harmless beyond a reasonable doubt because of the post-Miranda statements and one witness's identification of Holguin as the shooter. This conclusion, too, was objectively unreasonable.

First, the State court failed to make the proper inquiry--whether admission of the statements had a substantial and injurious effect on the verdict; instead, the court appeared to rule that because there was other, sufficient evidence to support the jury's verdict, the admission of the pre-Miranda statement was harmless error beyond a reasonable doubt. Such analysis was incorrect under federal law. See Ghent, 279 F.3d at 1127.

Second, the State court cited Arizona v. Fulminante in support of its decision. Yet, Fulminante demonstrates why the erroneous admission of the pre-Miranda statements was not harmless. In Fulminante, the trial court admitted two confessions made by the defendant to two different witnesses. The Supreme Court concluded that one confession was properly admitted and one not, and the Court determined that the improper admission of one confession was not harmless error despite the proper admission of the other confession. Id. at 299. The Court observed that absent the confessions, it was unlikely the defendant would have been prosecuted at all as the physical evidence and other circumstantial evidence would have been insufficient to convict. Id. at 297. Thus, the Court concluded, a successful prosecution depended on the jury believing both confessions. Id. The Court also concluded that absent the first (improperly admitted) confession, the jury might not have believed the witness testimony as to the second confession. Id. at 298.

15

As in <u>Fulminante</u>, Holguin may not have been prosecuted but for his statements. There is no physical evidence connecting him to the murder, and his identification by a single witness would probably not have been sufficient, especially given that Holguin did not match the description of the shooter. Thus, Holguin's statements, including his pre-<u>Miranda</u> statements, were central to the prosecution's case. The tape recording of the pre-<u>Miranda</u> statements was played to the jury, witnesses were asked numerous questions regarding its content, and the jury had a transcript of the statements with them during their deliberations.

And, as in <u>Fulminate</u>, the prosecution used the combined effect of all of Holguin's statements, including the pre-<u>Miranda</u> statements, in order to obtain Holguin's conviction. For example, in closing argument the prosecutor emphasized the existence of the multiple confessions:

> "He confessed over and over and over and over that he was the person who killed Erik."
>
> "[D]oesn't it take even more mental capacity to sit here and lie to the police officers on basically three different occasions, at the school, out at the scene looking for the gun, and on the taped interview, and lie about details and keep those lies pretty much straight."

The prosecution had to rely on the aggregate strength of multiple confessions, including the pre-<u>Miranda</u> confession, because Holguin's "confessions" got nearly all of the details of the murder wrong. For example, Holguin said Inzunza was wearing a blue sweater and beanie when he was shot. The evidence was undisputed, however that Inzunza was actually wearing a white shirt and no hat. Holguin also said that he was wearing his black and red 49ers jacket and black beanie when he shot Inzunza. According to witnesses, the shooter was wearing a white 49ers sweatshirt and a red hat. Holguin repeatedly told the officers that he shot Inzunza five to six times, yet Inzunza was shot just twice.

Holguin told the officers that, after the shooting, he got into the front driver's side of a "blue and black colorish" Oldsmobile, forcing the driver to get out and then back in again. Witnesses say that the shooter got into the back passenger side door of a blue Honda. Holguin reported that Inzunza did not say anything when he was shot. Eyewitnesses testified that Inzunza yelled when he was shot.

Holguin's confessions themselves were riddled with inconsistencies. For example, Holguin said that he knew Inzunza and he also said that he did not know Inzunza. He told the officers that he had a "beef" with Inzunza because he had problems with Inzunza's girlfriend, but he later said that Inzunza did not have a girlfriend. He also later stated that he did not have a "beef" with Inzunza. Holguin reported that he loaded the gun while walking up behind Inzunza. He also said that he loaded the gun in the car. When Officer Carmena suggested that Holguin might have hid the gun "outside someplace in a creek," Holguin said no. Later Holguin said that he hid the gun "in Salinas going out of town, in a little creek." Holguin first said that he washed dishes at his home before the shooting. He later said that he washed the dishes after the shooting.

Holguin's confessions also included statements that suggested he had only heard about the murder. He twice told the officers that he "heard" Inzunza was wearing a blue sweater and cap when he was shot. When the officers asked how he knew the time of the shooting, Holguin said "because it had it in the newspaper." Holguin explained that he returned to the scene, "to see, you know, maybe somebody shot somebody."

Thus, the prosecution was faced with a case with absolutely no physical evidence, one eyewitness, and the several statements of a 17-year old mentally retarded boy that were riddled with inconsistencies, got nearly all the details of the crime wrong, and suggested that the boy was merely repeating what he had heard from others. In such a situation, the prosecution had to, *and did*, emphasize that Holguin had repeatedly confessed in order to counter the unreliability of the confessions. In light of this record, there is no question that the admission of the pre-<u>Miranda</u> statements substantially influenced the jury's decision. At a minimum, there is certainly "grave doubt" as to the harmlessness of the error, and the State

court's conclusion to the contrary is unreasonable and contradicted by the very Supreme Court case upon which it relied. Accordingly, Holguin's conviction must be reversed.

**II.    Ineffective Assistance of Counsel**

Holguin also argues that his conviction should be reversed because his trial counsel rendered ineffective assistance by failing to move to suppress his post-Miranda statements on the grounds that his waiver of his Miranda rights was involuntary and not knowing and intelligent, and, in any event, his statements were involuntary.

At oral argument, the Court asked the parties whether Holguin's ineffective assistance claim would be moot if the Court concluded that Holguin is entitled to a new trial based solely on the improper admission of the pre-Miranda statements. At a new trial, Holguin's counsel can move to suppress the post-Miranda statements, and the state trial court can develop an evidentiary record and decide on a complete record, for the first time, whether such statements should be admitted at trial. In the Court's view, the interests of comity are best served by such a procedure.

The parties tentatively agreed that Holguin could move to suppress the post-Miranda statements at his new trial; however, the Court is reluctant to dismiss the ineffective assistance claims as moot if the State may take the position at Holguin's new trial that he is barred by res judicata or some rule of procedure from making such a motion. Accordingly, the State shall advise this Court in writing within 15 days of the date of this Order as to whether it concedes that Holguin may move to suppress the post-Miranda statements at his new trial, should the State choose to retry him. If the State does not so concede, the Court will decide Holguin's ineffective assistance of counsel claims.

**CONCLUSION**

The State court's decision that Holguin was not in custody when he made his first confession and that, even if he was in custody and it was error to admit such statements, the error was harmless beyond a reasonable doubt, involved an unreasonable application of federal law. The petition for habeas corpus is GRANTED. The State shall advise the Court in writing within 15 days of the date of this Order as to whether it agrees that Holguin may

1  move to suppress his post-<u>Miranda</u> statements at his new trial, should the State choose to
2  retry him.
3       **IT IS SO ORDERED.**



5  Dated: September 16, 2005

CHARLES  R.  BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2005\1118\habeasorder.wpd                    19